William H. COSBY, et ux. and Jack Barry Productions, Inc., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 168–83T, 432–83T.

United States Claims Court.

July 1, 1985.

Sara E. Lister, Washington, D.C., with whom was Patterson, Belknap, Webb & Tyler, for plaintiffs William H. Cosby, Jr. and Camille O. Cosby.

Sheldon S. Cohen, Washington, D.C., with whom were Roger A. Pies, Howard J. Hoffman and Morgan, Lewis & Bockius, for plaintiff Jack Barry Productions, Inc.

Gilbert W. Rubloff, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., for defendant.

## OPINION

KOZINSKI, Chief Judge.

These cases present the question whether tapes of *The New Bill Cosby Show* and *The Joker's Wild* qualify for investment tax credit (ITC) under 26 U.S.C. § 48(k) (1982).

### Facts

Plaintiffs in each of these cases [1] claim entitlement to an investment tax credit. The parties have entered into extensive stipulations and the court also heard testimony in Reno, Nevada; Los Angeles, California; and Washington, D.C. What emerged was a clear and comprehensive picture of the nature and market for plaintiffs' television shows and their place within the television entertainment industry.

*The New Bill Cosby Show*

*The New Bill Cosby Show* was a comedy-variety show broadcast on CBS between September 11, 1972, and May 28, 1973. During that time 22 episodes were produced and aired, six of which were shown twice. As the name suggests, the show featured Bill Cosby as star and host, as well as a group of regular supporting actors, dancers and musicians. Each week one or more guest stars appeared on the

---

1. The cases are not consolidated. Plaintiffs in each case are represented by separate counsel and have advanced somewhat different theories for recovery. Nevertheless, because the cases presented closely analogous issues and were filed at approximately the same time, the trials were conducted in tandem. Plaintiffs in each case presented separate witnesses while defendant's single witness testified only once for both cases.

show. The guests were selected principally on the basis of their popularity and the likelihood that they would interact well with Mr. Cosby. During the course of the 22 episodes, 40 guest stars appeared, including Pearl Bailey, Bill Withers, Sidney Poitier, Maxine Weldon, George Kirby, Anthony Newley and Groucho Marx.

*The New Bill Cosby Show* followed a typical comedy-variety show format: it generally contained a number of unconnected or loosely connected segments, each segment lasting from a few seconds to a few minutes. The segments consisted of comedy monologues by Mr. Cosby; dialogues between Mr. Cosby and his guest or guests, generally conducted in a humorous vein; comedy skits in which Mr. Cosby, guest performers and some of the show's regulars appeared as characters; and song and dance routines by guests and regular members of the cast.

The show was fully scripted; all dialogue was written out in advance, even where it appeared that Mr. Cosby and his guests were merely chatting. Indeed, every aspect of the show's production and execution was carefully planned and refined. Preparation for the taping of each episode involved numerous rehearsals, rewriting of script materials, construction of stage sets, selection of costumes and a variety of other activities. The taping itself was done using several cameras and frequently involved two or more takes of some segments. The tapes were then carefully melded and edited to produce the illusion of a single uninterrupted performance.

The show regularly employed ten script writers, an orchestra, a company of dancers, numerous technicians, costume designers, makeup specialists, stage hands and members of all the other professions customarily associated with a major television production effort. Approximately 110 people were on the show's payroll. The episodes cost an average of $186,528 to produce.

*The New Bill Cosby Show* was broadcast during prime time for the entire regular television season (September through May). With the exception of the Christmas show (which had a holiday theme) the episodes were not meant to be broadcast on any particular date or time of year. Depending on the production schedule and other factors, episodes were aired weeks, sometimes months, after they were taped.

*The New Bill Cosby Show* never achieved satisfactory ratings and CBS cancelled the show at the end of the 1972–73 season. The show has not been placed in syndication and has not otherwise been aired since the end of its network run.

### The Joker's Wild

*The Joker's Wild* is a half-hour game show where contestants compete for money and prizes on the basis of luck and knowledge of trivia. At the beginning of each show, the host introduces the contestants and exchanges a few words with them. Although the exchange appears to be spontaneous, host and contestants are encouraged to adhere closely to questions and answers prepared in advance. After these preliminaries, the contestants begin playing the game by alternately pulling the handle on a huge slot machine that serves as the show's centerpiece. The slot machine determines the category and value of the questions to be asked.

The questions fall into a variety of categories of general knowledge such as "Beverages," "Sky, Sea or Earth," "Women in History," and "Fictional Occupations." Approximately 50 subject matter categories are used each week (five shows); 150–200 questions are held ready for each show, 12–15 of which are actually asked.

Two or three people write and research the questions for the show. The questions are designed to test for general knowledge or trivia, while being informative and entertaining. The questions undergo significant culling and editing, with over half being rejected during the editing process. The show's producers make a conscious effort to avoid questions concerning current events. While some questions deal with events of recent history, they are generally

phrased so as not to assume temporal proximity.[2]

The show is taped in a studio before a live audience. While several shows are taped in a single session, the producers take pains to create the illusion that each show is taped on a separate day. For example, at the end of each show, contestants are asked whether they can return the following day to continue playing the game. Also, contestants are told to bring several sets of clothing and change between shows so as to give the impression that they went home overnight.

In addition to the writers, the show employs between 35 and 40 people, including the producer and his staff, the director, the assistant director, the judge, the host, the announcer, stagehands, cameramen, a sound crew, a lighting crew, the stage manager, wardrobe and make-up attendants, and security guards. Shows are taped using three cameras and are generally edited to meet time limits and other requirements.

*The Joker's Wild* first aired on CBS in September of 1972 and was shown every weekday. Three hundred shows were taped during that season and were broadcast consecutively. The show was cancelled by CBS in 1975. Plaintiff did not, at that time, make an effort to keep the tapes. In 1976 plaintiff learned that CBS had preserved tapes for approximately 693 episodes and would be willing to sell them for $100 a piece.[3] At that time, few game shows had been syndicated and conventional wisdom suggested that these tapes had no value. The show's producers nevertheless bought the tapes with the hope of finding a market for them. They succeeded in the early summer of 1976 when KHJ, an independent (i.e. non-network-affiliated) television station in Los Angeles, agreed to air the tapes, paying a relatively low licensing fee.

The tapes licensed to KHJ were those of *The Joker's Wild* first season and they became an instant success. Encouraged by this, plaintiff resumed taping the show, this time with the intention of syndicating it, that is, marketing it directly to local television stations rather than through one of the networks. *See* pp. 432–34 *infra*.

The syndicated version of *The Joker's Wild* proved successful and has appeared in numerous television markets throughout the United States. The show is now in its eighth year of syndication. For ease of reference, each year of syndication will be referred to as *Joker's Syndication I, Joker's Syndication II,* etc; network shows will be referred to as *Joker's Network I, Joker's Network II,* etc.[4]

The show's producers continue to seek out new markets for *The Joker's Wild.* When the show is introduced into a new market, airing normally begins with *Joker's Syndication I,* not the current year's production. Thus, at any one time, a number of seasons of *Joker's Syndication* may be airing in different parts of the country. Indeed, in Los Angeles, KHJ is currently broadcasting the show twice each weekday, with *Joker's Syndication VIII* showing in the early evening and *Joker's Syndication VI* each afternoon.

### The Market for Television Shows

The parties presented much evidence pertaining to the production and marketing of television shows in general. The subject is a broad one and, despite the excellent record produced by exceedingly diligent and cooperative counsel, the court cannot hope to fully appreciate, much less encapsulate in an opinion, all the intricacies of this complex and diverse industry. Nevertheless, certain facts relevant to the positions of the parties can be distilled from the evidence presented.

---

**2.** For example, a question used in 1977 was phrased "Which team did the Oakland Raiders play in the 1977 Super Bowl?" rather than "Which team did the Oakland Raiders play in this year's Super Bowl?"

**3.** This reflected only the original cost of the blank tape, plaintiff having retained all rights to the show itself.

**4.** Only *Joker's Network I, Joker's Network II, Joker's Network III,* and *Joker's Syndication I* are the subject of this lawsuit.

There are two principal methods for marketing television shows within the United States: network distribution and syndication. When a show is marketed by one of the television networks, each episode is broadcast throughout the United States on the same day, and generally at the same hour (allowing for time zone variations), through local network affiliates. Shows generally debut in the fall, at the beginning of a broadcast season. Pursuant to contracts with the producers, networks pay a licensing fee for each episode they broadcast. In the normal course of events, a show will run for a season during which time a number of original episodes and a smaller number of repeats will be broadcast.[5] If the show survives its first season, the network has the option of renewing the contract for subsequent seasons. The network will generally exercise that option so long as the show remains popular.

While networks present a single, national market for T.V. shows, syndication is an agglomeration of smaller local markets. When a show is syndicated, each licensed station has the right to broadcast the program only within a limited geographic area. Syndicated shows are bought by independent stations as well as network affiliates, the latter using syndicated material when network broadcasts are unavailable or unattractive. As a practical matter, network affiliated stations will not buy syndicated programming for prime time (Monday through Saturday, 8:00–11:00 p.m., and Sunday, 7:00–11:00 p.m. [EST]), when the networks offer their most popular shows.

There are two types of syndicated programs. The first consists of shows produced especially for syndication and never broadcast on network. This involves either original programming (shows never seen on network at all)[6] or new episodes of shows that once had a network run but were cancelled.[7] Non-network distribution of such original programming is known as first-run syndication. The second type of syndicated program consists of old episodes of shows that were once seen on network television.[8] This is known as off-network syndication.

Unlike network shows, syndicated shows are not broadcast at the same time and hour in all markets. Marketing arrangements differ significantly, depending on a variety of factors such as the popularity of the show, the station's market share and whether the station is affiliated with others. While a station may purchase rights to a syndicated show for a full season, other arrangements are common.[9] Because of this, even when a syndicated show is broadcast in several markets at once, the same episode or series of episodes will generally not be shown in all markets simultaneously.[10]

Off-network syndication plays a very important role in the economics of the syndication market as well as of some aspects of network marketing. Off-network syndicated programs are among the most popular and profitable of syndicated shows. Be-

5. The number of original episodes and the number of repeats will vary depending on several factors, primarily how often the show is to be broadcast each week. A weekly evening show will normally call for 39 original episodes and 13 repeats during a season. A daytime show that is broadcast each weekday will generally call for 195 original episodes, 65 of which will be repeated.

6. *Mary Hartman, Mary Hartman* and *Fernwood 2-night* are examples.

7. *Hee Haw, Fame* and *Too Close for Comfort* are examples, as is *Joker's Syndication.*

8. There are numerous examples, including *I Love Lucy, M\*A\*S\*H, Star Trek, Perry Mason,* *Gilligan's Island, Barney Miller, Flipper, Dallas* and *Hogan's Heroes.*

9. For example, a station may obtain a license for 50 episodes of a show, with the right to show each episode three times during the course of two years.

10. Even where stations in several markets broadcast the same season of a syndicated program, they will not generally show episodes simultaneously. This is because the show's producers try to minimize the number of outstanding tapes and therefore "bicycle" each episode from market to market, that is send it to one market where it is shown first, then on to a second market, and so on.

cause of rules promulgated by the FCC some years ago, networks may not have a financial interest in off-network syndicated shows. 47 CFR § 73.658(j) (1984). This means that when a show becomes successful in off-network syndication, the profits from that syndication inure entirely to the show's producer.

Traditionally, only two types of programs have been considered candidates for successful runs in off-network syndication: situation comedies (sitcoms) and dramatic shows (dramas). While other types of shows (such as game shows and variety shows) have been marketed off-network with some success, only sitcoms and dramas have earned very substantial revenues in off-network syndication. Indeed, the rewards from off-network syndication of sitcoms and dramas are so great they can outstrip, by an order of magnitude or more, the profits from a show's network run. Such profits are wistfully referred to in the industry as the pot of gold at the end of the rainbow.

On the other hand, very few network shows are successful off network. In the first place, to be suitable for off-network syndication, a sufficient number of episodes must be produced during a show's network run. Because syndicated shows are generally broadcast five times a week, while prime time network shows are only broadcast once a week, a show must have at least three network seasons to generate enough episodes for syndication. Of the many new shows introduced by the networks each year, relatively few are on the air long enough to warrant off-network syndication. In addition, a successful and extended network run does not guarantee success in syndication. Every year, therefore, only a few shows enter the off-net-

work syndication market and even fewer generate the fabulous profits producers dream of.

Producers and networks are aware of the risks and potential rewards from off-network syndication and negotiate licensing fees for new network shows accordingly. While it is difficult to quantify precisely the degree to which this is a factor in the negotiations, it is possible to say that it generally serves as the major financial incentive for producers of sitcoms and dramas to license their shows to the networks.[11]

The hope of riches from off-network syndication is not a significant factor in setting licensing fees for other types of shows such as game shows or variety shows. As of the tax years in question, and probably even today, the likelihood of syndicating such shows off network was relatively low and the potential rewards from such syndication were small. Therefore, such shows were produced for network broadcast only if the licensing fee was high enough to assure an immediate profit or if the producer derived some collateral benefit from the network broadcast.[12]

### Issues Presented

The ultimate question presented in each of these cases is whether plaintiffs are entitled to the benefits of an investment tax credit under 26 U.S.C. § 48(k) for *The New Bill Cosby Show* and *The Joker's Wild*, respectively. The section makes the credit available for video tapes that qualify under its subsection (1)(B), which provides that a tape is qualified if it is "created primarily for use as public entertainment or for educational purposes." A tape does not qualify under this definition if the market for the tape "is primarily topical or is

---

**11.** There is a dispute within the industry as to whether licensing fees paid by networks for sitcoms and dramas even compensate the producers for the cost of those programs. The answer to that question is hidden in the accounting practices of the various entities involved in producing television shows. This dispute need not detain the court. Suffice it to say that what the networks pay for such shows is significantly less than they would pay if the

producers did not have the expectation—or hope—of finding El Dorado in off-network syndication.

**12.** For example, a producer like Bill Cosby, who is also the star, might treat the show as an appropriate vehicle for expressing his creative talents and developing his public image.

otherwise essentially transitory in nature" (the "topical or transitory" test).

Pursuant to 26 U.S.C. § 38(b) (repealed 1984), the Commissioner promulgated a regulation further dealing with the question of whether the market for a tape is "topical or otherwise essentially transitory." The following is the text of the relevant portion of this regulation, with each sentence numbered for ease of later reference:

■ The term "qualified film" does not include any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature. [2] A film or tape is topical or essentially transitory in nature if it primarily deals with events and personalities of current interest at the time the film or tape is placed in service. [3] It does not matter that a film or tape which is topical or essentially transitory in nature may be shown in subsequent years or is actually shown in subsequent years. [4] These films or tapes include news shows such as the evening news and news specials relating to current affairs, interview shows such as "The Tonight Show" or "Meet the Press", game shows, award shows, and shows consisting of sporting events. [5] Similarly, variety shows do not qualify for the credit since they present entertainers primarily as personalities of current interest, as opposed to dramatic or situation comedy shows which present entertainers as characters in a dramatization. [6] Topical or transitory films and tapes do not include, however, dramatized recreations of recent events.

26 CFR § 1.48–8(a)(3)(iii) (1984).

Plaintiffs argue that the market for their tapes is not "primarily topical or ... otherwise essentially transitory in nature" under the language of the statute. They concede that the test enunciated in the second sentence of the regulation, which examines whether a tape "deals with events and personalities of current interest" (the "current interest" test), is a proper exercise of the Commissioner's authority. Plaintiffs main-

tain that their shows comfortably pass this test. Plaintiffs argue that insofar as the fourth and fifth sentences of the regulation purport to deny the credit, inter alia, to all game shows (the "game show exclusion") and to all variety shows (the "variety show exclusion"), they are invalid. Plaintiff Jack Barry Productions also argues that if the game show exclusion is read as completely denying the credit to producers of game shows, it is invalid on procedural grounds because it was added without the benefit of notice and comment, as required by the Administrative Procedure Act.

Defendant argues that none of the plaintiffs qualifies for the credit, either under the statute or the regulations. According to defendant, in enacting section 48(k) Congress meant to differentiate between two types of television programs: those that are produced for distribution at an immediate profit (without any reasonable hope of substantial additional profit through syndication), and those that are produced with the expectation that profits are to be derived, if at all, from syndication after a successful network run. In defendant's view, Congress was aware that only sitcoms and dramas fell into the latter category and created the credit to remove some of the financial risks of producing these types of programs. Under defendant's theory, the regulation merely recognizes this distinction, making it clear that sitcoms and dramas are entitled to the credit and that other types of programs (of which game shows, variety shows, interview shows and news shows are examples) are not.

Plaintiffs and defendant thus present dramatically different theories as to what Congress meant in passing section 48(k). Plaintiffs envisage a broad provision, excepting only a few types of programs, those that have an ephemeral market because they deal with issues of immediate and current interest (news shows and sporting events being the prototypical examples). Defendant views entitlement to the credit as much narrower, limited to two types of programs (sitcoms and dramas) and excluding all others.

### Discussion

#### A. *The Statute*

1. Section 48(k) was enacted as part of the Tax Reform Act of 1976, Pub.L. No. 94–455, § 804(a), 90 Stat. 1520, 1591–96 (1976). The section was intended to clarify a variety of issues pertaining to the availability of the investment tax credit for motion picture films and videotapes. While the legislation was successful in answering a number of outstanding questions,[13] it created its own set of uncertainties by introducing a totally new concept, namely the topical or transitory test. Neither the statute nor its legislative history give much insight into what Congress sought to achieve in excluding from the tax credit those tapes that fail to pass the topical or transitory test; nor is there much to suggest what meaning Congress attributed to these terms or how it expected courts to interpret them.

■ Nevertheless, a few observations can be made about the legislation. First, section 48(k), like the investment tax credit in general, was designed "to create jobs in the United States." H.R.Rep. No. 658, 94th Cong., 1st Sess. 188, *reprinted in* 1976 U.S.Code Cong. & Ad.News 2897, 3083 [hereinafter cited as House Report]; *see also* S.Rep. No. 938, 94th Cong., 2d Sess. 186, *reprinted in* 1976 U.S.Code Cong. & Ad.News 2897, 3617 [hereinafter cited as Senate Report]. Accordingly, in interpreting the statutory language the court ought, if possible, to apply the topical or transitory test so as to differentiate between those programs that tend to involve significant job creation and those that do not.

■ Second, there is a suggestion that, at least in a rough way, the topical or transitory test was considered a substitute for the useful life test that the 1976 Act eliminated. Thus, the committee reports state: "A taxpayer is not to receive a credit for any films of a transitory or topical nature (because almost all of these films have a useful life of less than three years)." House Report at 196, 1976 U.S. Code Cong. & Ad.News at 2897, 3090; Senate Report at 193, 1976 U.S.Code Cong. & Ad.News at 2897, 3625. The topical or transitory test should, if possible, be interpreted so as to distinguish between tapes that are likely to have relatively short useful lives and those whose useful lives are relatively long.

■ Third, while the statutory language speaks in terms of tapes "the market for which" is topical or otherwise primarily transitory, the legislative history consistently uses the terms in describing the *content* of the tapes.[14] This suggests that Congress intended that the credit be allowed or denied not on the basis of a particular tape's actual market performance, but on whether the content of the tape—its subject matter—is likely to have a continuing market appeal.

Finally, the legislative history gives examples of the kinds of shows that some of the drafters believed would fall on one side of the line or the other when the topical or transitory test was applied. Thus, the committee reports state that "the credit would be available for TV pilot films and dramatic

---

**13.** The statute followed numerous court decisions holding that motion picture films and videotapes were eligible for the credit and dealt with questions regarding entitlement to the credit between competing claimants, the method and percentages to be applied in determining the amount of a credit, and which costs of production were recoverable.

**14.** Both reports state flatly, "[f]ilms of a transitory or topical nature would not be eligible for an investment credit." House Report at 195, 1976 U.S.Code Cong. & Ad.News at 2897, 3090 (footnote omitted); Senate Report at 193, 1976 U.S.Code Cong. & Ad.News at 2897, 3624 (foot-

note omitted). *See also* House Report at 189, 1976 U.S.Code Cong. & Ad.News at 2897, 3083–84; Senate Report at 186–87, 1976 U.S.Code Cong. & Ad.News at 2897, 3617–18. The House Report to an early version of section 48(k) provided that "[f]ilms such as news features which are essentially transitory in nature, as well as films which are produced and shown exclusively in foreign countries, would not be eligible for the credit." Staff of Joint Comm. on Internal Revenue Taxation, 93d Cong., 2d Sess., Tax Reform Bill of 1974 Title II—Changes Primarily Affecting Corporations 7 (Comm.Print 1974).

or comedy series, such as 'Mod Squad' or 'The Mary Tyler Moore Show'." On the other hand, the reports expressed the view that "news shows, interview shows such as 'Johnny Carson' or 'Firing Line', or films or tapes of sports events," would not be entitled to the credit under this test. House Report at 189, 1976 U.S.Code Cong. & Ad. News at 2897, 3083–84; Senate Report at 186–87, 1976 U.S.Code Cong. & Ad.News at 2897, 3618. While legislative history cannot grant benefits withheld by the statutory language, or deny benefits the statute provides, the examples in the committee reports give an important clue to the meaning and purpose of the transitory or topical test as envisioned by some of the drafters of the legislation.

2. The terms "topical" and "transitory" are not terms of art; they have meanings that are established and generally accepted in the vernacular. "Topical," when used as an adjective, is understood to identify those matters that are of local or contemporary interest. Webster's New Collegiate Dictionary 1231 (1973) [hereinafter cited as Webster's]; Random House Dictionary of The English Language 1495 (1967) [hereinafter cited as Random House]; American College Dictionary 1277 (1962) [hereinafter cited as American College]. The term denotes issues of immediate, parochial interest, as opposed to those of broad, continuing or general interest. The adjective "transitory" identifies those matters that last only for a short time, that are fleeting or temporary. Webster's at 1241; Random House at 1505; American College at 1287.

If applied to the market for television tapes (as the statutory language does), the topical or transitory test seems to deny the investment tax credit to those tapes whose value is local or fleeting. If applied to the subject matter of the tapes (as the legislative history does), the topical or transitory language would seem to deny the tax credit to tapes dealing with subjects of parochial or immediate interest, losing all audience

appeal after a relatively short time. Under either view, the statute appears to reflect a congressional intent that the ITC be denied to those tapes that have a limited audience appeal to begin with, or that become worthless very soon after they are initially placed in service. Some of the examples given in the legislative history, such as news shows and sporting events, typify the kind of programs that would be denied the ITC under this interpretation. These programs generally will interest audiences only so long as they retain newsworthiness, because they deal with subject matter that is of immediate and fleeting interest. Except in rare circumstances, no one will be interested in seeing yesterday's news report or last week's football game.

This interpretation of the statute appears to conform reasonably well with what we know of the congressional purpose underlying section 48(k). Insofar as the topical or transitory test was meant as a substitute for the useful life test of earlier law, it makes sense to deny the credit for shows having fleeting audience appeal since tapes of those shows become worthless very quickly. Also, the kinds of shows that would typically be denied the credit under this test would be news shows, sporting events and similar programs involving the taping of live events having significance independent of television.[15] Insofar as the ITC was intended to help create jobs, Congress could well have thought it superfluous to grant the credit where the underlying event would be staged regardless of taping for television.

Defendant argues, however, that this interpretation of section 48(k) could lead to results unanticipated by Congress. Defendant suggests, for example, that not all sporting events have an element of temporal immediacy. While audiences may not be interested in last week's football game, they will watch dated tapes of other sporting events such as rodeos, bowling tournaments and demolition derbies. Defendant

---

**15.** Other examples of such shows might include broadcasts of beauty pageants, award presentations, circuses and parades.

also points out that the committee reports express the view that "interview shows such as 'Johnny Carson' or 'Firing Line'" would be denied the credit. Defendant has presented evidence that both of those shows, and others like them, have been syndicated after their original broadcast (sometimes in truncated form), presumably establishing that their market may not be entirely ephemeral. Defendant argues that interpreting the topical or transitory test narrowly might afford the credit to these shows also, contrary to legislative intent.

Defendant's argument is not without merit. No matter how the statute is interpreted, however, it is not possible to fully reconcile the statutory language with the House and Senate reports. While courts are bound to read legislation in light of congressional intent, if there is a conflict between language in a statute and that in a committee report, the statutory language must, of course, control. *Opal Manufacturing Co. v. UMC Industries*, 553 F.Supp. 131, 133 (D.D.C.1982).

Defendant suggests that it *is* possible to reconcile the statutory language with the examples in the committee reports through the approach adopted by the Internal Revenue Service and reflected in its regulations. This approach involves the examination of the market for television tapes in general rather than the content of particular tapes. According to defendant, television programs can be divided into two categories based on the manner in which they are financed and marketed. It is this distinction, defendant insists, that Congress sought to capture in the topical or transitory test. One group of programs consists of sitcoms and dramas. These types of programs are produced for network distribution at little profit or even at a loss. This is so because networks and producers are aware of the pot of gold at the end of the off-network syndication rainbow. *See* pp. 432–34 *supra*. The second group consists of all other types of programs— game shows, variety shows, news programs, interview shows, etc.—that are generally produced and sold to the networks at a profit, with no expectation of substantial additional gain from syndication.

Defendant suggests that Congress intended the investment tax credit for shows in the first category but not for those in the second because it wished to help only shows that are thinly or deficit financed. *See* pp. 433–34 & n. 11 *supra*. In terms of the statutory language, defendant argues that the market for sitcoms and dramas is not topical or transitory because they are the types of shows for which there will be an after-market in syndication if they have a successful network run. Other types of shows, defendant argues, are topical or transitory because they generally have no substantial aftermarket in syndication.

■ While defendant's interpretation appears to solve some problems, it creates others, more serious ones. In the first place, there is no hint that Congress was aware of the distinction suggested by defendant. The issue was not discussed, or even mentioned, in the committee reports, during the hearings or anywhere else in the legislative history. Nor is this distinction common knowledge so that Congress can be presumed to have been aware of it.[16]

16. Congress is presumed to be aware of business conditions in an area where it legislates. *United States v. Turner Turpentine Co.*, 111 F.2d 400, 404 (5th Cir.1940). However, awareness of general business conditions is not the same as clairvoyance. Congress cannot be presumed aware of facts that are not presented to it or documented in materials to which it had reasonable access such as books, periodicals, newspapers and government reports. As far as the court has been able to determine, such materials as were available fail to document the distinction defendant suggests was the focus of congressional concern in enacting the topical or transitory test. Perhaps the most significant of these materials is the FCC Office of Network Study, *Television Network Program Procurement: Second Interim Report-Part I, reprinted in* H.R.Rep. No. 281, 88th Cong., 1st Sess. 13 (1963) [hereinafter cited as House Rep. No. 281] issued by the Federal Communications Commission 13 years earlier. The report is detailed, extensive and "was designed and ... pursued on a broad and comprehensive scale." Letter of transmittal from Newton N. Minow, Chairman, Federal

Indeed, although the evidence presented by defendant suggests that producers of sitcoms and dramas *generally* receive less from the networks than producers of other shows, it is not clear that this is true in every instance. The parties agree that it is very difficult to determine a producer's precise profit or loss on a particular show, to some extent because common costs may be fully allocated to more than one project, distorting the profit and loss picture. Apparently, this is the subject of considerable dispute within the industry and nothing presented to the court enables it to resolve the issue.

Moreover, the language Congress actually adopted—the topical or transitory test—is ill suited to support the distinction defendant advances. If Congress perceived a special need to provide tax benefits to producers of sitcoms and dramas, it could have chosen language that would make its purpose clear by expressly so stating, or by allowing the credit only for shows that are thinly or deficit financed, or by providing that the credit is only available for shows that have a significant potential for off-network syndication. Congress instead chose language which, when fairly read according to its ordinary meaning, suggests an entirely different distinction, one based upon whether audience interest in the content of the tapes would diminish very quickly with the passage of time. It is difficult indeed to believe that Congress selected the language of the topical or transitory test to achieve the result advocated by defendant.

Further, a strict application of the distinction urged by defendant leads to anomalous results. Under defendant's theory, Congress wished to provide a credit for sitcoms and dramas produced for network distribution because such programs are thinly or deficit financed. However, some sitcoms and dramas are produced for first run syndication, bypassing network distribution altogether. *See* pp. 432–434 & nn. 6–8 *supra.* Producers of these types of programs cannot, of course, hope for the glittering profits associated with off-network syndication. Therefore, their financing would probably more closely resemble that of game and variety shows than that of network dramas and sitcoms: producers would have to make a profit, if at all, on the programs' original run. Under defendant's theory of what Congress attempted to do, such programs should no more be entitled to the ITC than game shows or variety shows. Yet, whatever Congress sought to achieve, there is no indication that it wished to give special tax preferences to network programs but not to identical programs distributed through first run syndication, cable or some alternative means. Indeed, defendant's own regulation affords the tax credit to all sitcoms and dramas regardless of their medium of distribution.

Defendant's interpretation of the topical or transitory test leads to another curious anomaly. Its test for whether the market for a program is topical or transitory turns, essentially, on whether the show is capable of syndication after its network run. As discussed earlier, however, of the many sitcoms and dramas that debut on the networks each season, very few become eligible for syndication. Yet, defendant would allow the credit for all shows in this category. This means that, under defendant's test, the credit is allowed to a very substantial number of shows that never achieve what is defendant's own benchmark of ITC eligibility, namely the possibility of participating in an off-network aftermarket. To state the matter somewhat differently, by defendant's own standard (i.e. eligibility for syndication), the market for most sitcoms

---

Communications Commission to Hon. Oren Harris, Chairman, Committee on Interstate and Foreign Commerce, House of Representatives (Feb. 4, 1963), *reprinted in* H.R.Rep. No. 281, 88th Cong., 1st Sess. 3 (1963). The report discusses at great length the economics of television program production and distribution, House Rep. No. 281 at 65–78, and specifically addresses the fact that there are significant profits to be made from syndication of successful network shows. *Id.* at 76–78. The report discusses the potential for such profits in terms of all television programs; it does not single out sitcoms and dramas for separate treatment, nor does it suggest that they are subject to different economic forces than other programs.

and dramas is every bit as transitory as that for variety shows, game shows and public affairs programs.[17]

Finally, the interpretation offered by defendant does not comport particularly well with the congressional purpose underlying the ITC, namely the creation of jobs in the United States. From the point of view of job creation there is little difference between sitcoms and dramas, on the one hand, and variety and game shows, on the other. As more fully discussed elsewhere, production of variety and game shows engages significant talent and other resources. *See* pp. 431–32 *supra;* p. 442, *infra; see also, Goodson-Todman Enterprises v. Commissioner,* 84 T.C. 255, 276 (1985). In fact, the production of game shows and variety shows involves "[d]irect production costs [such as] compensation payable to the actors and other production personnel ... [and] expenses for costumes, props, scenery, and similar items" for which Congress specifically meant to provide credits. House Report at 192, 1976 U.S.Code Cong. & Ad.News at 2897, 3086; Senate Report at 189, 1976 U.S.Code Cong. & Ad.News at 2897, 3621. It is difficult to say that variety and game shows create materially fewer domestic jobs than do sitcoms and dramas.

The only advantage offered by defendant's interpretation of the statute is that it may reconcile some of the examples provided in the legislative history, particularly those pertaining to T.V. interview shows. *See* p. 437 *supra.* Yet interview shows come in many varieties and those whose subject matter is primarily of fleeting or local interest will surely be excluded under the topical or transitory test. There is no indication that the drafters of the committee reports considered very carefully the examples they gave. They might well have been under the impression that all interview shows are the same and selected some examples without careful deliberation or analysis. This is far too slender a reed to support the massive construct suggested by defendant's interpretation of the statute.

■ In sum, this court concludes, as did the Tax Court in *Goodson-Todman,* that in enacting section 48(k) "Congress intended to deny the ITC to films that reasonably can be expected to become dated very rapidly." 84 T.C. at 270.

B. *The Regulation*

■ Having interpreted the statutory language, the court now turns to the regulation promulgated thereunder to determine whether it constitutes a reasonable exercise of the Commissioner's discretion under former section 38(b). In reviewing the regulation, the court is mindful that the Commissioner is afforded broad latitude in promulgating regulations and that a court ought not lightly set aside such regulations. *Commissioner v. Portland Cement Co.,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981); *Long v. United States,* 652 F.2d 675, 679 (6th Cir.1981); *Buczynski v. General Motors Corp.,* 616 F.2d 1238, 1243 (3rd Cir.1980), *aff'd sub nom., Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981); *Cleveland Electric Illuminating Co. v. United States,* 6 Cl.Ct. 711, 713 (1984). On the other hand, the Commissioner's authority to issue regulations is not a grant of legislative power; regulations must comport with the applicable statutory provision and may not deny a taxpayer benefits the statute affords him. *Commissioner v. Engle,* 464 U.S. 206, ——, 104 S.Ct. 597, 609, 78 L.Ed.2d 420 (1984); *Goodson-Todman Enterprises,* 84 T.C. at 276.

■ The first sentence [18] of the regulation merely restates the statute, providing that tapes and films will not be entitled to

---

17. This circumstance would not be troublesome if it described only isolated exceptions since few legal lines can be drawn with mathematical precision. Here, however, the formula suggested by defendant would fail to achieve what it considers the correct result in the vast majority of cases.

18. *See* p. 434 *supra,* for a numbered breakdown of the regulation.

the ITC if the market for them is topical or transitory. The second sentence sets up a new standard, the so-called "current interest test," which provides as follows: "A film or tape is topical or essentially transitory in nature if it primarily deals with events and personalities of current interest at the time the film or tape is placed in service." This portion of the regulation seeks to determine what the market will be for a tape or film by reference to its content. As the court has noted earlier, this is an entirely appropriate approach, one apparently adopted by the drafters of the committee reports.

A minor difficulty with this portion of the regulation is determining the precise scope of the phrase "events or personalities of current interest." Since television programs, like all entertainment vehicles, try to present material that is of interest to audiences at the time they see it, this phrase could encompass much or all of television programming. The phrase is also capable of a more restrictive reading, referring to events and personalities as to which audiences would have *only* a current interest, i.e. an interest that is immediate and fleeting and likely to fade rapidly with the passage of time. As so interpreted, the current interest test appears to reflect the intent of Congress in passing section 48(k) and is therefore a proper exercise of the Commissioner's regulatory authority.[19]

▆ Nor is there any difficulty in approving the third sentence of the regulation which makes the determination whether a tape or film is transitory or topical as of the time the tape is placed in service rather than on the basis of subsequent experience. It is entirely possible for a topical tape to gain a wider audience in later years. Yet, the determination of whether a tape is entitled to the ITC must be made when the tape is placed in service, and the Commissioner acts well within his discretion in making the determination conclusive as of that date. The parties are in agreement on this point.

▆ Similarly, there is no basis for disturbing the Commissioner's discretion in promulgating the second half of the fifth sentence and the entire sixth sentence of the regulation. This portion of the regulation creates safe harbors for certain types of programs, namely sitcoms, dramas and dramatic recreations of recent events. It is within the Commissioner's discretion to create such safe harbors by regulation, effectively waiving challenge to the topical or transitory nature of such programs.[20]

It is the fourth sentence and the first part of the fifth sentence of the regulation that raises serious concerns. These provisions purport to deny, on a wholesale basis, the ITC to various types of programs such as news shows, interview shows and sporting events. Among these exclusions are game and variety shows. A fair reading of these two sentences suggests that they were meant to deny the tax credit under section 48(k) to all shows falling within one of the listed categories. If this portion of the regulation is valid, plaintiffs will be denied a tax credit, regardless of any other consideration. The question therefore is

---

**19.** The current interest test is not the only one a program must meet in order to qualify for the ITC. This standard focuses on merely one aspect of the topical or transitory test which is fully incorporated in the first sentence of the regulation. A program might not deal with events or personalities of current interest and yet fail to qualify because it is excluded by another aspect of the topical or transitory test. For example, a program dealing with non-current issues that are of merely local interest, e.g. a show on local architecture, might fail to qualify for the ITC if the market for that tape does not extend beyond the locality in question.

**20.** Under the court's interpretation of section 48(k) it is entirely possible to have a dramatic show or situation comedy that does not qualify under the topical or transitory test. For example, dramatizations of recent events might well lose audience appeal very quickly. Similarly, shows satirizing local government or public officials, produced for distribution by a local television station, might have too narrow or too fleeting a market to qualify for the ITC under the strict language of the statute. Nevertheless, the Commissioner may overlook these exceptions in the interest of administrative convenience and grant the credit to all sitcoms and dramas, as he has in fact done.

squarely presented whether the Commissioner may deny all game shows or variety shows the ITC under section 48(k). The record here discloses, and the court finds, that *The New Bill Cosby Show* is a typical variety show and that *The Joker's Wild* is a typical game show.[21]

### 1. *The Variety Show Exclusion*

■ The evidence presented establishes that *The New Bill Cosby Show* qualifies for the tax credit under the court's interpretation of the topical or transitory test of section 48(k), as well as under the current interest test of the regulation. The show was created and produced for national distribution, and did not deal with issues of local or parochial interest. Like many other variety shows, its subject matter consisted of comedy monologues (generally by the show's star, Mr. Cosby); comedy skits; musical numbers; and occasional "dialogues" between the star and his guests, all carefully scripted to achieve a comedic effect or other entertainment objective. The monologues and comedy skits did not deal with matters of transitory interest such as recent news events. Indeed, episodes of the show were taped weeks, sometimes months, before they were broadcast. Had they contained topical material, their entertainment value would have been diminished by the passage of time.

Each show contained a number of skits, generally in a humorous vein, that differed very little in form or substance from similar segments of situation comedies. Indeed, the show featured a repertoire of recurring characters (generally performed by Mr. Cosby) who were shown in various humorous situations, not unlike characters in a sitcom. Like sitcoms and dramas, the show employed a large supporting staff, from script writers and editors to camera operators and wardrobe attendants. An

episode of *The New Bill Cosby Show* engaged no less effort and talent (and created no fewer jobs) than a sitcom or drama of equal duration. Indeed, since sets and costumes for *The New Bill Cosby Show* changed each week, and were often quite elaborate, there is support for the view that greater effort and more resources were expended.

The show's guest stars were selected for audience appeal, as were the show's regulars. In selecting guests, the producers looked for people who would be popular with the audience because of their reputation as entertainers, not because of association with recent events.[22] While host and guests engaged in friendly banter, these exchanges were entertainment vehicles not real conversations meant to disclose topical information. In short, *The New Bill Cosby Show* did not contain topical or transitory material and did not deal with events or personalities of current interest.

Nevertheless, the regulation denies the ITC to all variety shows "since they present entertainers primarily as personalities of current interest." 26 CFR § 1.48-8(a)(3)(iii) (1984). This explanation rings hollow in light of the evidence presented. It is quite clear that *The New Bill Cosby Show* did not attract an audience because viewers were interested in learning more about the current affairs of Mr. Cosby, his guests or his regulars. The show was a sophisticated amalgam of comedic and musical segments; audiences watched because they enjoyed the display of talent exhibited by the performers, not out of an interest in their personal lives.

The regulatory drafters appear to have viewed variety shows as little more than live events (similar to plays and concerts) taped for television.[23] The evidence dem-

---

**21.** The court expresses no view, of course, as to the quality of these shows. In finding that they are typical the court merely indicates that they are not unusual in their mode of production, distribution, content or audience appeal.

**22.** The single exception appears to have been Mark Spitz who appeared on the show in the

fall of 1972 after his triumph at the Munich Olympics.

**23.** In the preamble to the Federal Register notice adopting the final regulations the drafters note that "examination of the legislative history leads to the conclusion that Congress did not intend that a mere video and sound recording of

onstrates this view to have been in error. Although the show was taped before a studio audience, the similarity with a live event ended there. The show was carefully staged and rehearsed with the single view of producing a tape for network distribution; the audience, admitted free of charge, was there merely to assist in the taping process by encouraging the performers through applause, laughter and visual feedback. Taping of the show was frequently stopped and scenes were sometimes performed more than once. The finished tape was an edited product consisting of the best parts of the final performance and the dress rehearsal.

██ One additional point merits attention. Plaintiff's contract with the network called for a series of 22 shows during a season, with six of those shows to be repeated. This is a common, though annoying, practice in the television industry. When shows are produced not merely for initial distribution, but also to be broadcast again many months later, it is difficult indeed to characterize the market for such shows as topical or transitory. The fact that an episode is able to attract an audience for a second broadcast suggests that the viewer interest in the show does not lie in its relationship to current events or personalities of fleeting notoriety; it also indicates that audiences do not watch the show to learn some *denuement* about the performers. This practice of planned rebroadcasts strongly supports the conclusion that the market for *The New Bill Cosby Show* was not topical or transitory.

██ The court is unable to square the regulation's categorical denial of the ITC to variety shows with the language of the statute. That portion of the regulation is therefore held to be invalid.[24]

### 2. *The Game Show Exclusion*

██ The record establishes that *The Joker's Wild* also qualifies for the ITC under both the topical or transitory test and the current interest test. Both the network and syndicated versions of the show were produced for national distribution; neither deals with issues of local or parochial interest. Contestants are selected from all parts of the country. Their place of origin is mentioned by way of background, but a conscious effort is made to avoid associating the show with a particular locality or geographic area. Any effort in that direction would defeat plaintiff's goal of making the show nationally popular.

Nor does the show deal with matters of immediate or fleeting interest such as events in the news. The questions asked of contestants are designed to test general knowledge in a wide variety of subjects. The show's writers and producers make a concerted effort to delete or rephrase questions that would date the show in any way. *See* p. 3 *supra.*

Neither the show's host nor the contestants are personalities of current interest. Although the host is a popular and experienced game show personality, he is not the subject of news headlines or otherwise of current interest.[25] Someone watching the show would learn very little about the host himself beyond his appearance, voice and personality. The contestants are selected on the basis of their knowledge of trivia and not because they are, or might be, known to the audience. To the contrary, the producers of *The Joker's Wild* reject potential contestants who have appeared on too many other game shows or might otherwise be known to the viewing public.

The game show exclusion was not in the regulation as originally proposed on De-

---

a ... performance or event would automatically qualify for the credit." 44 Fed.Reg. 20416 (1979) (codified at 26 CFR 1.48–8(a)(3)).

**24.** A variety show would, of course, have to pass the current interest and the topical and transitory tests to be entitled to the ITC. As noted in

the text, *The New Bill Cosby Show* amply does so.

**25.** While Jack Barry, the original host of the show is now deceased, this appears to have had little or no effect on the continuing popularity of *Joker's Syndication.*

cember 20, 1977, but was added in the final regulation.[26] The reasons for the addition are nebulous, particularly because only two comments were received pertaining to game shows, both of them suggesting that game shows ought to be included among the shows deemed entitled to the credit. The only clue to the thinking behind the game show exclusion is the phrase in the prefatory comment to the final regulation stating that "Congress did not intend that a mere video and sound recording of a game ... would automatically qualify for the credit." 44 Fed.Reg. 20416 (1979) (codified at 26 CFR 1.48–8(a)(3)). The regulatory drafters once again missed the mark. Television game shows like *The Joker's Wild* are not events with significance independent of television, like the World Series or the Olympics. Rather, they are created and produced specifically and exclusively for distribution through the medium of television. Unlike spectators at sporting events, game show studio audiences are admitted free of charge for the sole purpose of assisting the television production effort by giving encouragement and visual feedback to the contestants and the host. In further contrast to sporting events, the vast majority of the viewing audience has little or no interest in the outcome of a game show, except as sympathies might be aroused by a particular contestant's performance. An audience survey discloses that *The Joker's Wild* is popular with audiences because viewers learn new information (from the questions and answers); they like the personality of the host; they like to test themselves against the contestants; they find the cash and prizes exciting; and they find the show amusing. The

notion, apparently reflected in the regulations, that game shows are merely video recordings of live events, simply does not comport with reality.

As with variety shows, it is significant that game shows are produced with the intent that a number of episodes will be repeated each season. For the reason stated earlier, this factor strongly undercuts the notion that the market for these shows is topical or transitory. *See* p. 20 *supra*. This reasoning applies with particular force to *Joker's Syndication*, which was produced for initial distribution through syndication rather ·than a network. As discussed earlier, shows produced for first run syndication are introduced in various local markets at different times. It is not unusual for a producer to begin marketing a show by licensing it to only five or ten large markets; as the show proves successful, the producer is able to capture other markets, frequently starting in each new market with the first episode of the series. To be successful in first run syndication, therefore, a show has to be suitable for broadcast, in one local market or another, months or even years after it is first produced. A show whose content is topical or transitory (such as one dealing exclusively with current events) simply will not be suitable for first-run syndication.

■ For the reason stated above, the court rules that the game show exclusion is not supported by section 48(k) and is therefore invalid.

### Conclusion

Plaintiffs in both cases are entitled to recover for all tax years in issue. No later

---

**26.** It is this late addition of the game show exclusion that forms the basis of plaintiff Jack Barry Productions' argument that the exclusion is invalid for failure to comply with the notice and comment provisions of the Administrative Procedure Act. As a general rule, the APA does not require a new notice for every revision of a proposed regulation. However, plaintiff points out that when a revision adds "substantive new matter" or amounts to a "complete turnaround," the agency must give the public additional notice of the change and an opportunity to provide comments. *American Standard, Inc. v. United*

*States,* 602 F.2d 256, 220 Ct.Cl. 411, 430 (1979); *Wing v. Commissioner,* 81 T.C. 17, 35 n. 24 (1983); *Southern Pacific Transportation Co. v. Commissioner,* 75 T.C. 497, 650 n. 174 (1980). Here, plaintiff complains, the proposed regulation did not contain a categorical exclusion of all game shows while the final regulation did. Plaintiff argues that this constituted the addition of substantive new matter and therefore required an opportunity for public comment. In light of the court's resolution of the substantive issues, it need not address this procedural argument.

than July 12, 1985, the parties shall file stipulations in each case as to the proper amount of the judgment. The clerk shall then issue judgments accordingly, together with interest as provided by law and costs.