*Decision will be entered for the respondent.*

BUDGET FILMS, INC., A CALIFORNIA CORPORATION, PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7342–81.    Filed July 29, 1985.

*Marcus Kalb*, for the petitioner.
*Karen J. Simonson*, for the respondent.

WILBUR, *Judge*: Respondent determined deficiencies of $5,949 in petitioner's Federal income taxes for the taxable year ended April 30, 1977, and of $9,240 for the taxable year ended April 30, 1978.

After concessions by both parties, the issue for decision is whether petitioner is entitled to claim the investment tax credit under section 48(k)[1] with respect to various motion picture films. Specifically, we must address the following issues:

(1) Whether the films constitute "new section 38 property";

(2) Whether the films are "qualified films"; that is, whether they were created "primarily for use as public entertainment or for educational purposes," and do not have markets that are "primarily topical" or "otherwise essentially transitory in nature"; and

(3) Whether, at best, petitioner is entitled to only two-thirds of the claimed credit because it failed to make a proper election under section 48(k)(3).

## FINDINGS OF FACT

The parties submitted a detailed stipulation of facts, and those facts are so found. The stipulation of facts and attached exhibits are incorporated by this reference.

Budget Films, Inc., is a corporation organized under the laws of California. Its principal place of business was in Los Angeles, California, when the petition was filed in this case. Petitioner timely filed Federal corporate income tax returns for the taxable years ended April 30, 1977, and April 30, 1978.

Petitioner was in the business of renting films to the general public during the years in issue. Its customers included individuals, colleges, religious institutions, shipping lines, movie studios, and production companies. The customers

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated, and any reference to Rules refers to the Tax Court Rules of Practice and Procedure.

usually ordered films through Budget Films catalogs. Budget Films generally prohibited its customers from renting films for "theatrical" purposes; that is, the customers were not generally entitled to charge admission to audiences, and they were not permitted to show the films on television.

Budget Films spent $57,878 in the taxable year ended April 30, 1977, and $86,050 in the taxable year ended April 30, 1978, in order to acquire prints and negatives of films. Approximately $35,885 of the $57,878 paid by petitioner for film prints and negatives during the taxable year ended April 30, 1977, was paid for prints of films that had been shown to the public before petitioner acquired them. Likewise, approximately $36,544 of the $86,050 petitioner paid to acquire film prints and negatives during the taxable year ended April 30, 1978, was paid for prints of films that had been shown to the public before petitioner acquired them.

The following films were new and had not been released to the public in any format before petitioner acquired them and placed them in service: "The End," "Story Theatre No. 7," "Story Theatre No. 11," "Story Theatre No. 15," "Story Theatre No. 19," "Story Theatre No. 23," "Marvin," and "Spaghetti Western." "The End" and the "Story Theatre" group of films were acquired for $4,080 in the taxable year ended April 30, 1977. "Marvin" and "Spaghetti Western" were acquired for $2,300 in the taxable year ended April 30, 1978. Petitioner asserts that it is entitled to claim a tax credit of 10 percent of the amount it paid to acquire the films, or $408 for 1977, and $230 for 1978. Respondent asserts that only two-thirds of these amounts, or $272 for 1977 and $153 for 1978, are allowable as tax credits.

The above films were not the only films released by Budget Films for the first time. In addition, in the taxable year ended April 30, 1977, petitioner acquired footage of Spanish bull-fights which it edited into a 30-minute film entitled "Bullfights from Spain." Petitioner paid $2,250.98 to acquire the film, edit it, create a negative, and make prints. The footage had not been released before petitioner distributed it. Moreover, in the taxable year ended April 30, 1978, Budget Films acquired, for $5,121.75, several films of live Beatles concerts. Petitioner arranged to edit some of the films, and distributed them with the titles "Around the Beatles," "Beatles at Shea Stadium,"

"Beatles Concert in Tokyo," and "Beatles Concert in Washington, D.C." The films were made by amateurs and had not been distributed before petitioner acquired them.

Petitioner also acquired a rare nitrate print of Rudolfo Goana, a famous Mexican bullfighter. A fee of $1,800 was paid to acquire the print, edit and restore it, and make a negative and prints. Although the film may have been released in Mexico before petitioner acquired it, it was never released in the United States.

All of the films described below were composed entirely of individual segments of film that had been or may have been exhibited to the public before petitioner acquired them. Petitioner generally made longer films by connecting several of the film segments and sometimes by editing the longer film reel. The following films were composed of groups of cartoons or short subjects:

| | Acquisition cost | |
|---|---|---|
| Name of film | Apr. 30, 1977 | Apr. 30, 1978 |
| "30 Color Cartoon Programs" | $3,600 | - - - |
| "Variety Programs #1–10" | 1,000 | - - - |
| "Warner Brothers Color Cartoon Programs #1–5" | 500 | - - - |
| "Mighty Mouse Color Cartoon Packages #1–4" | 400 | - - - |
| "Terrytoon Color Cartoon Packages #1–4" | 400 | - - - |
| "Spook Spectacular Programs, Shows #1–4" | 850 | - - - |
| "30 Color Cartoon Programs" | - - - | $3,600 |
| "Variety Programs #11–20" | - - - | 1,000 |
| "Warner Brothers Color Cartoon Programs #6–10" | - - - | 500 |
| "Mighty Mouse Color Cartoon Packages #5–8" | - - - | 400 |
| "Terrytoon Color Cartoon Packages #5–8" | - - - | 400 |
| "Spook Spectacular Programs, Shows #7–12" | - - - | 850 |
| Total | 6,750 | 6,750 |

Petitioner arranged to splice two or three cartoon or short subjects together and distributed them as reels of two or three, but otherwise did not edit the films in any way. The films had been released in other media, on television or in movie theaters, but they had been released individually, and not in the format in which petitioner distributed them.

The following films were acquired as individual newsreels, serials, trailers, and footage of sporting events, and were packaged by petitioner in groups. Petitioner arranged to splice

the footage together and paid for other miscellaneous editing involved in preparing the final reels. Petitioner also paid for prints which were distributed as films ranging from 10 minutes to feature length. Petitioner does not know whether the individual newsreels and other footage had been exhibited to the public prior to being assembled in their current format. They had not been released previously in the format in which petitioner released them.

| | Acquisition cost | |
|---|---|---|
| Name of film | Apr. 30, 1977 | Apr. 30, 1978 |
| "Vintage Sports Reels #1–10" (newsreels and sports footage) | $1,500 | - - - |
| "Old Time News Reels #1–4, Nickelodeon Theater #1–2" (newsreels and comedy shorts) | 2,500 | - - - |
| "Purple Death, Three Musketeers, Phantom Creeps, Hurricane Express, Lost City" (serials) | - - - | $7,600 |
| "Camps of the Dead, Auto Racing, Dangerous Wheels and Rudders, Holocaust, In Famous [sic] Age of Crime, From Dunkirk to Hiroshima, Disasters of 30's, Terror of the Third Reich, Riots and Rebellions, Spectacular Disasters" (newsreels) | - - - | 10,500 |
| "Variety Boxing Reels #1–10" (newsreels; sports footage) | - - - | 2,475 |
| "Crime Does Not Pay" (newsreels) | - - - | 850 |
| "World War II: A History" (newsreels) | - - - | 900 |
| "British Trailer Reel, Black Preview Trailer Reel, Elvis Trailer Reel, Movie Trailer Reels #1 and 2" (trailers) | - - - | 2,125 |
| Total | 4,000 | 24,450 |

The following films were composed of several short subjects of musical variety entertainment, most of which had been released previously as "soundies."[2] These films were acquired

---

[2]A film released in "soundie" format can be viewed only by looking into a machine.

in the taxable year ended April 30, 1978, and were compiled and distributed as packages. They had not been released as packages previously.

| Name of film | Acquisition cost |
|---|---|
| "Sepia Stars on Parade, Shows #1–4" | $850 |
| "Turn Out the Lights, Gale Storm Sings, Jon and Sandra Steele Sing, Polka Dot Polka, Sarah Vaughn Sings, Sepian Swing, Musical Satires" | 2,000 |

The following films, acquired during the taxable year ended April 30, 1977, were composed of parts of some very old French and American films which petitioner edited into 10- or 20-minute reels and first released in new format in the taxable year ended April 30, 1978: "Best of the Melies," "Fantastic Films," "Films by Three French Pioneers," "Early French Comedies," "Emil Cohl Films," "Emil Cohl-Jean Durand," "Animation No. 1," and "Moments from 'Birth of a Nation.' " The cost of purchasing the old films, having them edited, and having new negatives and prints created was $6,234.34. "Birth of a Nation" had been released before petitioner acquired it. Petitioner does not know whether the other films in this category had been released previously. None of the films had been released previously in the format in which petitioner released them.

In the taxable year ended April 30, 1977, petitioner acquired several 16 millimeter Charlie Chaplin "Kodascope" prints that had been distributed by Eastman Kodak in the 1930's. Petitioner arranged to splice together three 80-minute reels, each consisting of four 20-minute short subjects. The total cost was $4,922. The short subjects had been released before petitioner acquired them but had never been released in the format in which petitioner distributed them. Petitioner called the films "Charlie Chaplin Cavalcade," "Charlie Chaplin Festival," and "Charlie Chaplin Carnival."

The remainder of the expenditures at issue (approximately half of the total expenditures for which the investment tax credit was claimed) were made with respect to films that had been released previously and were not altered in any way by petitioner.

OPINION

We must decide whether the investment tax credit is available for each of petitioner's films. To claim the investment credit for movie and television films pursuant to section 48(k),[3] the taxpayer must show that three requirements have been met: (1) The film must be "new section 38 property," (2) the film must be "qualified," and (3) the taxpayer must have an "ownership interest" in the film. The first two requirements are at issue in this case.

*Issue 1. New Section 38 Property*

"Section 38 property" means, among other things, tangible personal property with respect to which depreciation is allowable. Sec. 48(a). "New section 38 property" is defined in section 48(b) as section 38 property—

(1) the construction, reconstruction, or erection of which is completed by the taxpayer after December 31, 1961, or
(2) acquired after December 31, 1961, if the original use of such property commences with the taxpayer and commences after such date.

Property is considered to have been constructed, reconstructed, or erected by the taxpayer if the work is done for him in accordance with his specifications. Sec. 1.48–2(b)(1), Income Tax Regs. The term "original use" means "the first use to which the property is put, whether or not such use corresponds to the use of such property by the taxpayer." Sec. 1.48–2(b)(7), Income Tax Regs.

_____

[3]Sec. 48(k) provides as follows:

SEC. 48(k). MOVIE AND TELEVISION FILMS.—
(1) ENTITLEMENT TO CREDIT.—
(A) IN GENERAL.—A credit shall be allowable under section 38 to a taxpayer with respect to any motion picture film or video tape—
(i) only if such film or tape is new section 38 property (determined without regard to useful life) which is a qualified film, and
(ii) only to the extent that the taxpayer has an ownership interest in such film or tape.
(B) QUALIFIED FILM DEFINED.—For purposes of this subsection, the term "qualified film" means any motion picture film or video tape created primarily for use as public entertainment or for educational purposes. Such term does not include any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature.
(C) OWNERSHIP INTEREST.—For purposes of this subsection, a person's "ownership interest" in a qualified film shall be determined on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of such film.

We must decide whether the investment tax credit is available for four general categories of films: (1) Films that had been exhibited to the public before petitioner acquired them, and that petitioner did not alter in any way, (2) films that had never been exhibited to the public before petitioner acquired them, (3) a film that may have been exhibited in Mexico, but was not exhibited in the United States before petitioner acquired and released it unaltered, and (4) films composed of a group of individual film segments that had been or may have been exhibited to the public previously.

The films in the first category (previously exhibited and unaltered) clearly do not constitute new section 38 property because they were "acquired" and were first released by someone other than petitioner. Indeed, petitioner did not even address this category of films on brief. On the other hand, the films in the second category (never exhibited prior to petitioner's acquisition) clearly do constitute new section 38 property, and respondent concedes as much. The only real questions relating to "new section 38 property" arise in connection with the third and fourth categories of films.

The third category consists of a film that may have been exhibited in Mexico, but had not been exhibited in the United States before petitioner acquired it. Since petitioner stipulated that it "does not know" whether the film was released in Mexico, it has not satisfied its burden of proof or its burden of coming forward with evidence to rebut the presumption of correctness relating to the notice of deficiency. We thus must proceed on the presumption that the film had been exhibited to the public in Mexico. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111 (1933).

Section 1.48–8(a)(2), Income Tax Regs., provides that:

> Once a qualified film is placed in service in any medium of exhibition in any geographical area of the world, it becomes used property and no investment credit with respect to the film is available to a taxpayer that acquires the film after that time (except for subsequently incurred costs described in paragraph (e)(9) of this section which the taxpayer incurs). * * *

This Court recently stated in *Fife v. Commissioner*, 82 T.C. 1, 15 (1984), that "section 1.48–8(a)(2), Income Tax Regs., is not unreasonable or inconsistent with section 48(k) and is, therefore, valid." Petitioner has not shown that the film met the

conditions of this regulation, and therefore the investment tax credit is unavailable. See *Fife v. Commissioner, supra.*[4]

The fourth category consists of reels of film composed of individual film segments that had been or may have been exhibited to the public previously.[5] Respondent asserts that all of the films in this category were "acquired" by petitioner, and thus that only those films the original use of which commenced with petitioner are eligible for the credit. Petitioner maintains that the films were "reconstructed" and therefore constituted new property in its hands. We do not believe that the changes made to petitioner's films amount to a "reconstruction" of the films, and we therefore hold that these films do not constitute new section 38 property in petitioner's hands.

Section 1.48–8(a)(2), Income Tax Regs., provides that once a qualified film is placed in service *"in any medium of exhibition"* (emphasis added) it becomes used property,[6] and states by way of example that "a film previously exhibited in theaters will not be new section 38 property even when modified for television."

Section 1.48–8(e)(9), Income Tax Regs., defines certain "subsequently incurred costs" for which the investment tax credit is allowable in years after the film is placed in service. See section 1.48–8(a)(1) and (2), Income Tax Regs. The only allowable subsequently incurred costs are those incurred in "preparing prints placed in service within 12 months after the film * * * is initially released for public exhibition in any medium, residuals * * *, and participations."[7] The regulation specifically states that "the cost of additions, modifications, or editing of a film for a new medium incurred after the film is placed in service, is not includible in production costs."

---

[4] Cf. *Nabakowski v. Commissioner*, T.C. Memo. 1982–743. Petitioner stipulated that the fee of $1,800 "covered the nitrate print, the negative, some editing and restoration work, and the prints." Without more evidence, we are unable to conclude that "some editing and restoration work" amounted to reconstruction of the property. See discussion *infra.*

[5] With respect to the stipulation that the film segments "may have been" exhibited previously, we reach the same conclusion that we reached *supra;* namely, that petitioner has not met its burden of proving that the films had never been released. Rule 142(a). We therefore presume, for this issue, that all film segments were exhibited previously.

[6] The term "medium of exhibition" is defined in the regulation to include, "for example, free television (network telecasts and television syndications) or movie theaters. The term does not include the video tape or video disc household markets." Sec. 1.48–8(a)(2), Income Tax Regs.

[7] "Residuals" and "participations," defined in sec. 1.48–8(e)(3) and (4), Income Tax Regs., relate to contingent compensation payments and are not relevant to the instant case.

Thus, the regulations address additions, modifications, and editing changes made to adapt a film to a new medium. They specifically state that the costs of making such changes are not eligible for the investment tax credit if the changes are made in years after the films have been placed in service. We think the clear implication of the regulations is that such changes do not amount to "reconstruction" of the property.

In the case before us, petitioner has failed to prove that the nature of its modifications amounted to more than the changes dismissed as "subsequently incurred costs" in the regulations. The stipulation states, for example, that petitioner purchased used cartoons and short subjects, "arranged to splice two or three cartoon and/or short subjects together," and distributed them as reels of two or three. Other footage was described only as having been "spliced together" and edited in some mysterious "miscellaneous" manner. Musical variety entertainment was described only as having been "compiled and distributed as packages." These modifications, without more, do not create "reconstructed" films.

### Issue 2. Qualified Films

Some of petitioner's films had not been released before petitioner acquired them, and therefore constitute new section 38 property. As to several of these films, however, respondent argues that they do not constitute "qualified" films within the meaning of section 48(k)(1)(B). Specifically, respondent maintains that the following films are not qualified: (1) "Bullfights from Spain," (2) "Around the Beatles," (3) "Beatles at Shea Stadium," and (4) "Beatles Concert in Tokyo," "Beatles Concert in Washington, D.C."

Section 48(k)(1)(B) defines the term "qualified film" as—

any motion picture film or video tape created primarily for use as public entertainment or for educational purposes. Such term does not include any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature.

Respondent maintains that "Bullfights from Spain" and the Beatles films are films the markets for which are "primarily topical or otherwise essentially transitory in nature." This Court examined this statutory language and the pertinent regulation for the first time in *Goodson-Todman Enterprises,*

*Ltd. v. Commissioner*, 84 T.C. 255 (1985), on appeal (2d Cir., May 31, 1985). See also *Cosby v. United States*, 8 Cl. Ct. 428 (1985). The regulation states as follows:

(iii) *Topical or transitory films and tapes.* The term "qualified film" does not include any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature. A film or tape is topical or essentially transitory in nature if it primarily deals with events and personalities of current interest at the time the film or tape is placed in service. It does not matter that a film or tape which is topical or essentially transitory in nature may be shown in subsequent years or is actually shown in subsequent years. These films or tapes include news shows such as the evening news and news specials relating to current affairs, interview shows such as "The Tonight Show" or "Meet the Press", game shows, award shows, and shows consisting of sporting events. Similarly, variety shows do not qualify for the credit since they present entertainers primarily as personalities of current interest, as opposed to dramatic or situation comedy shows which present entertainers as characters in a dramatization. Topical or transitory films and tapes do not include, however, dramatized recreations of recent events. [Sec. 1.48–8(a)(3)(iii), Income Tax Regs.]

It seems that this regulation requires us to examine the subject matter of the film at the time the film is placed in service. Timing is crucial, because a film concerning events and personalities of current interest when the film is made may no longer contain current subject matter when it is placed in service.

A film is placed in service:

when it is first exhibited or otherwise utilized before the primary audience for which the qualified film was created. Thus, a qualified film is placed in service when it is first publicly exhibited for entertainment purposes * * *. * * * A qualified film is not placed in service merely because it is completed and therefore in a condition or state of readiness and availability for exhibition * * * [Sec. 1.48–8(a)(5), Income Tax Regs.]

The films at issue were placed in service sometime during or after 1977. We therefore must determine whether the subject matter of the films concerned events and personalities of current interest sometime during or after 1977.[8]

---

[8]The regulation's definition of a topical film as one relating to events and personalities of current interest, comports with the commonly accepted meaning of the term "topical" as "local or designed for local application," "referring to the topics of the day or place," or "of local or temporary interest." The term "transitory" means "tending to pass away," "not persistent," or "of brief duration." *Goodson-Todman Enterprises, Ltd. v. Commissioner*, 84 T.C. 255, 277 (1985), on appeal (2d Cir., May 31, 1985); *Cosby v. United States*, 8 Cl. Ct. 428 (1985).

Respondent maintains that "Bullfights from Spain" is a film consisting of sporting events," and therefore is specifically disqualified by section 1.48–8(a)(3)(iii), Income Tax Regs. We believe, however, that respondent is reading the language of the regulation out of context. Films of sporting events are aimed at topical or transitory markets only if the sporting events are "current" when the film is placed in service. While bullfighting may be a "sport," it may also be a subject of long-term cultural and historical interest. This film was not aimed at a market interested in bullfighting as a current sporting event, but rather was aimed at a market consisting of colleges, religious institutions, shipping lines, movie studios, and production companies. In *Goodson-Todman Enterprises, Ltd. v. Commissioner, supra* at 275, we declined to interpret the regulation as if it established a blanket rule that all game shows are not qualified films. We stated that "To so presume would require us to hold the regulation invalid" because it would exclude game shows that are not, in fact, aimed at topical or transitory markets. See also *Cosby v. United States, supra.* This reasoning applies with equal force to films of sporting events. Because "Bullfights from Spain" was not aimed at a market interested in bullfighting as a current sporting event, we hold that the film meets the current interest test.

Respondent argues that the Beatles' films are "merely recording[s] of performances or events which are primarily topical, regardless of the fact that the films may be shown repeatedly in subsequent years. They do not show the Beatles * * * as characters in a dramatization." We think that, among other things, respondent has overlooked the importance of timing on this issue. Even if it can be argued that the footage may have been disqualified as being topical at the time it was filmed, by 1977, the concerts can hardly have been called "events of current interest," or events of local or temporary interest. See note 8 *supra.* And to argue that the films must show the Beatles as characters in a dramatization in order to qualify is to miss the whole point of the regulation and possibly the Beatles as well. The statute and the regulation seek to exclude films that are merely of current or topical interest; they certainly do not require that events be portrayed through dramatized re-creations rather than live footage. The

language in the regulation pertaining to dramatized re-creations of events merely provides an exception to the current interest rule: events that appeal to topical or transitory markets may be portrayed in qualified films if they are portrayed through dramatized re-creations rather than through live footage. Since, in any event, the Beatles' concerts were no longer "topical" in 1977, if indeed they ever were, the language has no application here.

## *Issue 3. Amount of Credit Available*

Petitioner claimed an investment tax credit equal to 10 percent of the total cost it incurred in acquiring or reconstructing the films at issue. Respondent maintains that to the extent any credit is allowable, petitioner may claim only 10 percent of $66\frac{2}{3}$ percent of the basis of the property.

Section 48(k)(2) provides that "except as provided in paragraph (3), the applicable percentage under section 46(c)(2)[9] for any qualified film shall be $66\frac{2}{3}$ percent." Paragraph (3) of section 48(k) states that:

(A) IN GENERAL.—If the taxpayer makes an election under this paragraph, the applicable percentage under section 46(c)(2) shall be determined as if the useful life of the film would have expired at the close of the first taxable year by the close of which the aggregate amount allowable as a deduction under section 167 would equal or exceed 90 percent of the basis of the film. [Sec. 48(k)(3)(A).]

The 90-percent rule, in contrast to the general rule of section 48(k)(2), requires a determination of useful life on a film-by-film basis, and each film's useful life is treated as ending "at the close of the year by the end of which the aggregate allowable deductions for depreciation equal at least 90 percent of the basis of the film." Joint Comm. on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, at 177–178, 1976–3 C.B. (Vol. 2) 189–190.

The 90-percent rule is available to a taxpayer only if the taxpayer makes a proper election. Sec. 48(k)(3)(B); sec. 1.48–8(c)(2), Income Tax Regs. For taxable years ending before April 5, 1979, including the years at issue in the instant case,

---

[9]Sec 46(c)(2) is the general code section that prescribes the amount of investment tax credits available for eligible property.

the election is valid only if the taxpayer files by July 5, 1979, a return or amended return with the District Director having audit jurisdiction over the last return to which the election relates indicating that the taxpayer wishes section 48(k)(3) to apply.

Petitioner's Federal income tax returns were admitted into evidence, and having examined them we conclude that the returns give no indication that petitioner wished to elect the application of section 48(k)(3). Therefore, only the amount provided in section 48(k)(2) is allowable as a credit.

*Decision will be entered under Rule 155.*

