APIS PRODUCTIONS, INC., PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 1849-82.        Filed June 16, 1986.

*Ronald L. Blanc* and *Daniel J. McLoon*, for the petitioner.
*Charles O. Cobb*, for the respondent.

COHEN, *Judge*: Respondent determined deficiencies in petitioner's Federal income tax of $402 and $79,871 for the taxable years ended July 31, 1976, and July 31, 1977, respectively. The only issue for decision is whether the video tapes of certain television variety shows produced by petitioner constitute "qualified film" under section 48(k)(1)(B),[1] which is eligible for the investment tax credit.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner is a California corporation and, at the time its petition herein was filed, had its principal place of business in Beverly Hills, California. Petitioner timely filed Federal income tax returns for the fiscal years ended July 31, 1976, and July 31, 1977.

### *The Programs in Issue*

From 1971 to 1977, petitioner and one or more related entities produced three successive series of television vari-

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

ety programs involving petitioner's sole shareholder, Cher (a.k.a. Cher Bono and Cher Bono-Allman). The first series, entitled "The Sonny & Cher Comedy Hour," consisted of 60 programs produced from 1971 to 1974. The second series, entitled the "Cher Show" consisted of 30 programs produced in 1975. The third series, entitled the "Sonny & Cher Show," consisted of 34 programs produced from late 1975 through 1976. Such programs shall hereinafter collectively be referred to as the "programs."

All of the programs had similar format and content. Each program was 1 hour in broadcast duration, began with Cher (or Sonny Bono and Cher) making a musical entrance followed by a comic monologue (or dialogue), presented a series of comic vignettes or sketches that were intertwined with musical material, and concluded with Cher (or Sonny Bono and Cher) extending a farewell to the audience. (The opening and closing portions of the programs were typically the only parts taped before an audience.) The comic sketches often involved recurring characters portrayed by Cher, Sonny Bono, and members of the programs' company of regular performers. Guest stars, i.e., outside celebrities who appeared in a particular program, participated in these sketches by portraying new characters who interacted with the continuing characters.

Preparation for each season of programs began in the spring. At that time petitioner hired the writers, set designer, choreographer, and other "creative" staff who began to develop the "concept" for the season. Because, except for the Christmas show, it was not known at this time when particular material would be aired within the broadcast season, petitioner attempted to avoid topical material and to choose guest stars possessing long-term and not solely current popularity. The programs did, however, contain a small amount of material relating to current events.

Soon thereafter, the complex process of writing scripts for each show and designing the sets and costumes began. This process required significant editing and integration of the various functions. Virtually all conversations during the programs, including apparent banter and "ad-lib" comments, were scripted.

Taping of the programs began approximately 2 months after the initial writing. At the beginning of a week of taping, performers read and commented upon the script and rehearsed their performances. Actual taping occurred for several days at the end of the week. Material was taped without regard to the order in which it would be broadcast; material to be used in several different programs (e.g., several episodes of a recurring sketch) were often taped in a single session; and petitioner typically taped several "takes" of each scene. Substantial editing of the tapes was therefore necessary. Initial broadcasting of the programs occurred between 1 and 17 weeks after taping.

Producing the programs required more extensive set and costume design, rehearsal, and taping than most situation comedies and films. The production employed between 160 and 200 people each season.

### The Market for Television Programs

The market for any television program may be defined in many ways, including the following:

(1) The geographic area within which a program may be shown, such as the United States, a foreign country, or the regional area for a particular television station;

(2) The medium of exhibition for the program, such as network television, independent television stations, or cable;

(3) The time of day, or "daypart," within which the program will be shown;

(4) The interest in or demand for the program;

(5) The method of distribution used to exploit the program, such as network broadcast, first-run syndication, or off-network syndication;

(6) The audience for the program, including its demographic characteristics; and

(7) The type of program, such as game show, drama, situation comedy, or variety show.

Network broadcast programs are licensed by the networks from the programs' producers and obtained by local stations through interconnection with their networks. Syndicated programs, by contrast, are licensed, usually on an exclusive basis, to one station in a particular geographic market. There are two major types of syndicated programs,

original productions made for the syndication market ("first-run syndication") and reruns of network programs ("off-network syndication"). Because stations affiliated with a network typically carry the network's regular programming, they usually do not broadcast syndicated programs during primetime, i.e., between 8 and 11 p.m. (EST) Monday through Saturday and between 7 and 11 p.m. (EST) Sunday and the period of the day during which viewing levels and advertising rates are highest.

It is difficult, if not impossible, to predict the ultimate success of a particular television series when initially broadcast (on a network or otherwise) or the demand that may thereafter develop to warrant its further commercial exploitation. Many network television series are canceled before the end of a single season and many others last only for a season. Only a small percentage of all programming produced for network broadcast ever reaches off-network syndication.

Demand for particular types of television programs is cyclical. The most popular and therefore the most common type of primetime programs thus change from year to year. For example, at the time of trial, "western" dramatic programs were no longer broadcast on primetime television, whereas such programs were once very common on primetime. Similarly, variety shows experienced declining popularity before the early 1970's, which accelerated after that time.

### Performance of the Programs

Programs in each series were broadcast initially over the CBS television network at the rate of one program per week. Each broadcast season extended from the fall through the spring and concluded with a summer rerun period. In addition, during the year ended July 31, 1976, CBS broadcast reruns of programs produced between 1971 and 1974.

Broadcast revenues earned by petitioner from the programs in the year ended July 31, 1976, were $6,877,256, which consisted of $5,680,000 initial network broadcast fees, $1,120,000 network rerun fees, and $77,256 foreign syndication fees. Broadcast revenues for the year ended July 31, 1977, were $6,280,328, which consisted of $5,520,000 initial

network broadcast fees, $750,000 fees for network reruns, and $10,328 for foreign syndication. Total costs associated with the programs were $7,305,677 and $6,064,810 during those years, respectively.

In 1980, approximately 3 years after the last of the programs was initially broadcast over the CBS network, petitioner began negotiations with Viewing Concepts, Inc., d.b.a. On-the-Air (OTA), for off-network syndication of the programs in the United States. Yosh Productions, Inc. (Yosh), an entity related to petitioner, and OTA ultimately agreed upon the syndication in 1981 and 1982 of 29 programs initially broadcast between 1971 and 1977. Under the agreement, 6 of the 29 syndicated programs would be broadcast twice. In exchange for granting to OTA the exclusive right to distribute the programs (in their original 1-hour form edited only for commercial time), Yosh was to receive 50 percent of all net profits from syndication.

At least 23 television stations located throughout the United States broadcast the syndicated programs. Net profits from syndication totaled approximately $541,000 (revenues of $1,550,000 less costs of $1,009,000) during 1981 and 1982.

On its Federal income tax returns for the years ended July 31, 1976, and July 31, 1977, petitioner claimed investment tax credits of $473,714 and $869,106, respectively, for its costs of producing the master video tapes of the programs placed in service during the applicable year and its costs of rebroadcasting master video tapes of those programs previously placed in service and rebroadcast during the applicable year. Because of the limitations of section 46(a)(3), only $402 and $79,871 of the claimed credits were available to reduce petitioner's tax liability for those years, respectively. Respondent denied in full the credits claimed by petitioner on the ground that the programs did not qualify for the investment tax credit under section 48(k).

## OPINION

The only issue for decision is whether the programs, variety shows produced by petitioner, constitute "qualified film" under section 48(k)(1)(B), which is eligible for the

investment tax credit.[2] The parties have stipulated that the programs satisfy all of the other requirements for the credit and do not dispute the amount of the credits available to petitioner, if the programs are eligible for the credit. Moreover, the parties agree that the programs were "created primarily for use as public entertainment." Thus the sole question before us is whether the programs are ineligible for the investment tax credit because of the second sentence of section 48(k)(1)(B), providing that the term "qualified film" "does not include any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature."

This Court first examined the purpose for and operation of section 48(k) in *Goodson-Todman Enterprises v. Commissioner*, 84 T.C. 255, 268-270 (1985), affd. 784 F.2d 66 (2d Cir. 1986), in which we stated:

Congress believed it desirable to eliminate the uncertainties in the state of the law, to prevent costly litigation generated by those uncertainties, and to foster accurate investment planning for the movie industry in future years. H. Rept. 94-658 (1975), 1976-3 C.B. (Vol. 2) 880; S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 223. Accordingly, Congress directly addressed the availability of the ITC by enacting section 48(k) as a part of the Tax Reform Act of 1976. * * *

* * * Congress attempted to clarify in general which films would be eligible for the ITC. In this endeavor, Congress enacted section 48(k)(1), the provision most directly applicable in the instant case. As noted previously, that section makes the ITC available only with respect to a "qualified film," which is defined to mean "any motion picture film or video tape created primarily for use as public entertainment or for educational purposes." The term "qualified film" expressly does not include "any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature." The statute does not define the foregoing exclusionary language. Furthermore, the legislative history is not altogether illuminating with respect to the congressional intent underlying the statutory language in that it does not give a substantive explanation of that language but merely provides examples of films Congress considered as qualifying and nonqualifying. The relevant legislative history states as follows:

"For the future, as a general rule, * * * taxpayers are to receive two-thirds of a full credit for all their films regardless of the actual useful

---

[2]Sec. 48(k)(1)(B) provides:

(B) QUALIFIED FILM DEFINED.—For purposes of this subsection, the term "qualified film" means any motion picture film or video tape created primarily for use as public entertainment or for educational purposes. Such term does not include any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature.

life (or foreign use) of any particular film. This rule will apply to all films placed in service * * * regardless of whether any particular film had a useful life of 7 years or more (so that it would be entitled to a full credit if judged on an individual .basis), or less than 3 years (so that it would not be entitled to any credit if judged separately). The credit is to be available only for 'qualified films', i.e., motion picture films or television films or tapes created primarily for use as public entertainment, and educational films, i.e., generally films used in primary or secondary schools, colleges and universities, vocational and post-secondary educational institutions, public libraries and government agencies (thus, for example, excluding industrial training films). Also, the credit would be available for TV pilot films and dramatic or comedy series, such as 'Mod Squad' or 'The Mary Tyler Moore Show.' However, the credit would not be available for films which were topical or transitory in nature, such as news shows, interview shows such as 'Johnny Carson' or 'Firing Line', or films or tapes of sports events, even though some of these shows might be shown in subsequent years. * * * [S. Rept. 94-938, *supra*, 1976-3 C.B. (Vol. 3) at 224-225; fn. ref. omitted.]"

See also H. Rept. 94-658, *supra*, 1976-3 C.B. (Vol. 2) at 881.

Presumably, the statutory "topical or transitory" test was intended to serve as a replacement for a useful life determination. As indicated previously, section 48(k) was enacted in part to eliminate the uncertainty existing under prior law with respect to the determination of useful life. In order to achieve that goal, Congress provided a general rule that permitted taxpayers to claim a two-thirds credit on all qualified films regardless of useful life. However, Congress apparently determined that inasmuch as other types of qualifying property were not entitled to any credit if their useful lives were less than 3 years, a film or tape, the market for which is primarily topical or transitory in nature, should also be excluded from the benefits of the credit since it reasonably could be expected to have a useful life of less than 3 years. Thus, it is stated in the legislative history that "A taxpayer is not to receive a credit for any films of a transitory or topical nature (because almost all of these films have a useful life of less than three years)." H. Rept. 94-658, *supra*, 1976-3 C.B. (Vol. 2) at 888. *Notwithstanding the foregoing, it is clear that Congress did not intend to equate the "topical or transitory" test with a less-than-3-year useful life. The legislative history makes it clear that an otherwise qualifying film is entitled to the ITC even if it has a useful life of less than 3 years.* See S. Rept. 94-938, *supra*, 1976-3 C.B. (Vol. 3) at 224; H. Rept. 94-658, *supra*, 1976-3 C.B. (Vol. 2) at 881. *Moreover, section 48(k)(1)(A)(i) expressly provides that the determination of whether the credit is allowable with respect to a film or tape is "determined without regard to useful life." We think that a fair reading of the precise statutory language, when coupled with the surrounding legislative history, suggests that Congress intended to deny the ITC to films that reasonably can be expected to become dated very rapidly.* [Fn. ref. omitted. Emphasis supplied.]

We further concluded that Congress used the terms "topical" and "transitory" in their ordinary, everyday sense, i.e., "of local or temporary interest" and "of brief duration," respectively. 84 T.C. at 277. Both the Court of Appeals for the Second Circuit, in affirming our decision in *Goodson-Todman Enterprises v. Commissioner*, 784 F.2d 66 (2d Cir. 1986), and the Claims Court in *Cosby v. United States*, 8 Cl. Ct. 428 (1985), interpreted section 48(k) similarly.

In holding that the game show in issue in *Goodson-Todman* and the game and variety shows in issue in *Cosby* were not "topical or transitory" under section 48(k)(1)(B) and hence were eligible for the investment tax credit, this Court, the Second Circuit, and the Claims Court examined both the characteristics of and market for those shows. Although there might exist some confusion surrounding the statute's focusing upon *market* whereas the legislative history (as quoted in *Goodson-Todman Enterprises v. Commissioner, supra*) focuses upon *content* in determining whether a film or tape is topical or transitory (see *Goodson-Todman Enterprises v. Commissioner*, 84 T.C. at 271, 277, affd. 784 F.2d at 70; *Cosby v. United States*, 8 Cl. Ct. at 436), the two foci are inseparably linked. Where the content of a program is topical or transitory, one would expect its market to be likewise limited. See *Goodson-Todman Enterprises v. Commissioner*, 784 F.2d at 70.

As did the Commissioner in *Goodson-Todman* and the Government in *Cosby*, respondent herein relies primarily upon section 1.48-8(a)(3)(iii), Income Tax Regs., for disqualification of the programs. That regulation provides:

(iii) *Topical or transitory films and tapes.* [1] The term "qualified film" does not include any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature. [2] A film or tape is topical or essentially transitory in nature if it primarily deals with events and personalities of current interest at the time the film or tape is placed in service. [3] It does not matter that a film or tape which is topical or essentially transitory in nature may be shown in subsequent years or is actually shown in subsequent years. [4] These films or tapes include news shows such as the evening news and news specials relating to current affairs, interview shows such as "The Tonight Show" or "Meet the Press", game shows, award shows, and shows consisting of sporting events. [5] Similarly, variety shows do not qualify for the credit since they present entertainers primarily as personalities of current interest, as opposed to dramatic or situation comedy shows which present entertain-

ers as characters in a dramatization. [6] Topical or transitory films and tapes do not include, however, dramatized recreations of recent events.

According to respondent, we must sustain the regulation as a reasonable interpretation of the statute, and the regulation's absolute exclusion of variety shows from "qualified film" must apply to the programs.

The essence of respondent's argument in support of the regulation is that it, like the congressional committee reports accompanying section 48(k)(1)(B), properly defines "qualified film" by listing examples of programs that do and programs that do not qualify. According to respondent, the regulation's differentiation between situation comedies and dramatic shows on one hand and most other shows, including variety shows, on the other hand is supported by both content and market differences between the two categories. Respondent asserts that these differences result in situation comedies and dramatic shows possessing a substantially longer expected economic life than news, interview, variety, and game shows and hence justify the variety show exclusion.

Before examining the purported content and market distinctions raised by respondent, we note that respondent's position is little more than a thinly veiled attempt to resurrect the 3-year useful life test for films. As he argues in his brief:

Mathematical precision, in terms of years, is not required. What is required is the reasonable expectation that the film will remain productive *over a period of time commensurate with other investment credit property*. [Emphasis supplied.]

This argument is inconsistent with the abolition of the useful life requirement in section 48(k)(1)(A) and has been explicitly rejected by the courts. See *Goodson-Todman Enterprises v. Commissioner*, 784 F.2d at 77.

The purported "content" distinctions drawn by respondent are nothing more than superficial differences in format. Respondent argues that situation comedies and dramatic shows are unique in presenting a single "story" in each episode, whereas the other types of shows either report several discrete events or focus upon the activities or performances of featured personalities.

Respondent does not dispute, however, that producing the programs required substantial advance preparation, a large staff, fully scripted dialogue, elaborate costumes and sets, and substantial rehearsal, taping, and editing. See *Cosby v. United States*, 8 Cl. Ct. at 442. Although each of the programs did involve unrelated sketches as well as musical performances, the sketches possessed continuity from show to show. Most importantly, unlike the "segments" of news and interview shows, the sketches and performances contained in the programs did not focus primarily on items of current interest. The programs were initially broadcast up to 17 weeks after taping, and petitioner did not know when during the season a particular program would be broadcast. It was therefore essential that the programs not contain significant amounts of topical or transitory material, which would become dated very rapidly. Cf. *Goodson-Todman Enterprises v. Commissioner*, 84 T.C. at 272; *Cosby v. United States*, 8 Cl. Ct. at 442. Thus, from the standpoint of content and production, the programs were similar to situation comedies and dramatic shows but were quite different from the news and interview shows to which Congress intended to deny the credit.

Respondent's attempt to equate variety shows with news and interview shows based solely upon format thus lacks any rational basis in the statute or legislative history. Where a class of programs, like the variety shows in issue, possesses the permanence and durability required by section 48(k)(1)(B), whether such programs' format is unitary or fragmented is irrelevant. Cf. *Budget Films, Inc. v. Commissioner*, 85 T.C. 114, 125 (1985). As the Court of Appeals stated in *Goodson-Todman Enterprises v. Commissioner*, 784 F.2d at 76, "It would make as much sense to exclude from the ITC all programs which are two hours long, all those printed on 16 millimeter film, or all programs introduced by a host." Perhaps a closer analogy would be the arbitrariness of denying the credit to programs presenting a series of short stories and allowing it to serialization of novels.

Respondent's purported distinction based upon the market for television shows is also flawed. According to respondent, only programs that, at the time of production,

may reasonably be expected to experience off-network syndication possess sufficient expected economic lives to justify the credit. Respondent's expert witness at trial, Alan Pearce (Pearce), concluded that network comedy and drama series were substantially more likely to be successful in off-network syndication than were variety series. Pearce based his opinion upon his empirical study indicating that, between 1965 and 1984, 23 percent of comedy series and 26 percent of drama series but only 8 percent of variety series initially broadcast over the networks subsequently appeared in off-network syndication. According to Pearce's study, percentages for shows remaining in off-network syndication for more than 2 years were 19 percent for comedy series, 17 percent of drama series, but only 1 percent for variety series.

Petitioner raises a number of objections to Pearce's expertise, his sample, the premises relied upon by Pearce in his study, and the statistical accuracy of the results that he obtained. We need not, however, examine petitioner's objections. Even if we accept Pearce's conclusions as to the syndication market,[3] the distinction drawn by Pearce and relied upon by respondent fails to support the regulation as a valid interpretation of section 48(k)(1)(B).

Pearce's study indicated that, based upon the Nielsen ratings (i.e., a common measure of audience appeal), variety series were significantly less successful in *network* performance than were comedy and drama series and that this trend accelerated in the early 1970's. As Pearce's report acknowledged, a series' performance on network affects its syndication potential, both because network performance indicates audience appeal and because off-network syndication is not possible without the production of a sufficient number of network programs. Thus Pearce's conclusions regarding the syndication market for variety, comedy, and drama series may reflect nothing more than the cyclical unpopularity of variety shows. Although respondent urges us that his conclusions based on Pearce's study are consistent with Congress' use of the term "market" (as

---

[3]The Claims Court in *Cosby v. United States*, 8 Cl. Ct. 428, 434 (1985), found as a fact that the potential for off-network syndication was significantly greater for comedy and drama series than for variety series.

opposed to content) in section 48(k)(1)(B), nothing indicates that Congress intended qualification for the credit to be based upon changing audience preference for particular types of shows. With the unpredictability of taste, such a test could only be applied in retrospect, which would be an anomaly for an incentive, such as the investment tax credit.[4]

Respondent contends that Congress was well aware of the relatively higher probability of off-network syndication of comedy and drama shows and, on that basis, intended to extend the credit to those shows but not to variety shows. Respondent's argument ignores that the probability of success in off-network syndication is low for all shows— comedy, drama, and variety alike. It is unlikely that Congress intended to favor all comedy and drama shows based upon off-network success when less than one quarter of such shows experienced this success. The evidence in the present case, including a 1980 report of the Federal Communications Commission submitted by respondent, indicates that the television market is considerably more complex than the bifurcation based upon off-network syndication urged upon us by respondent. For example, the record indicates that several variety series were quite successful in *first-run* syndication.

If Congress perceived a special need to provide tax benefits to producers of sitcoms and dramas, it could have chosen language that would make its purpose clear by expressly so stating * * * or by providing that the credit is only available for shows that have a significant potential for off-network syndication. * * * [*Cosby v. United States*, 8 Cl. Ct. at 439.]

The performance of the programs, both on the CBS network and in syndication, confirms that they possessed the temporal durability required by section 48(k)(1)(B). In addition to rebroadcasting the programs during the rerun season each year, CBS in 1976 rebroadcast shows initially aired as early as 1971. Through the syndication arrangement with OTA, 29 of the 124 programs were rebroadcast at least once, on stations located throughout the United

[4]Pearce proclaimed that his research in 1985 was a breakthrough in previously unstudied areas. Thus neither Congress nor business decision makers could have anticipated the specific "findings" of his study. We agree with petitioners that the research appears to be a means of creating scientific support for respondent's hypothesis, i.e., an advocate's tool, rather than a broad industry analysis that would be persuasive to Congress or the Court.

States, as long as *10 years* after their initial network broadcasts. Cf. *Goodson-Todman Enterprises v. Commissioner*, 84 T.C. at 278 (market for game shows not topical or transitory where programs rebroadcast up to 3 years after production). Such market performance is not necessary, nor perhaps even sufficient, for qualification under section 48(k)(1)(B). Compare *Cosby v. United States*, 8 Cl. Ct. at 431 (market for variety shows not topical or transitory even though shows *never* rebroadcast after *single* broadcast season), with S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 255, and H. Rept. 94-638 (1975) 1976-3 C.B. (Vol. 2), 695, 881 (topical or transitory programs do not qualify for the credit even though rebroadcast in subsequent years).[5]

Respondent contends that the blanket exclusion for variety shows in the regulation is justifiable based upon administrative convenience. The Supreme Court stated in *Commissioner v. Engle*, 464 U.S. 206, 227 (1984), however, that the Treasury may not "make [a tax] * * * statute 'simpler to administer,' * * * by ignoring the language of the statute, the views of those who sought its enactment, and the purpose they articulated." (Quoted in *Goodson-Todman Enterprises v. Commissioner*, 784 F.2d at 76.) As this Court and two others have previously unequivocally held, Congress' purpose in enacting section 48(k)(1)(B) was to allow the investment tax credit for films and video tapes that would not become dated very rapidly after initial exposure. As the legislative history indicates, news shows, interview shows, and films or tapes of sporting events all lie outside the congressionally favored category. So, too, may certain types of variety programs. Variety shows like the programs in issue, however, do not. Neither the record nor common experience suggests that the programs are atypical variety shows. See also *Cosby v. United States*, 8 Cl. Ct. at 442. We therefore reject the blanket exclusion of variety shows from "qualified film" by section 1.48-8(a)(3)(iii), Income Tax Regs.

---

[5]Respondent argues that, because the determination of whether a program qualifies for the investment tax credit must be made when the film or tape is placed in service, the subsequent performance of the programs is irrelevant. In *Goodson-Todman Enterprises v. Commissioner*, 84 T.C. 255, 278 (1984), affd. 784 F.2d 66 (2d Cir. 1986), however, we considered broadcast history of the game shows in issue as indicating durable audience appeal and thus that the market for the shows was not topical or transitory.

We are quite aware of our duty in passing upon the validity of Treasury regulations. As we stated in *Goodson-Todman Enterprises v. Commissioner*, 84 T.C. at 274-275:

Treasury regulations normally are given considerable weight by the courts and should be upheld unless they cannot be interpreted in a fashion consistent with the statutory language they seek to administer or they fail to harmonize with manifest congressional design. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24 (1982); *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948); *Fawcus Machine Co. v. United States*, 282 U.S. 375, 378 (1931); *Lykes Bros. Steamship Co. v. United States*, 513 F.2d 1342, 1350 (Ct. Cl. 1975). Furthermore, "legislative regulations," such as the regulations issued under section 48, are entitled to even greater weight than regulations issued pursuant to the general authority granted by Congress under section 7805(a). *Fife v. Commissioner*, 82 T.C. 1, 15 (1984). * * * [In] interpreting a regulation, "the courts should, if possible, avoid a construction which will bring into question" its validity (see *Steen v. Commissioner*, 61 T.C. 298, 304 (1973), affd. per curiam 508 F.2d 268 (5th Cir. 1975), accord, *Dunn v. Commissioner*, 70 T.C. 715, 726 (1978), affd. 615 F.2d 578 (2d Cir., 1980)) * * *

In *Goodson-Todman* we therefore interpreted the regulation's exclusion of game shows as not prescribing an inflexible, absolute standard. See also *Budget Films, Inc. v. Commissioner*, 85 T.C. 114, 125 (1985).

In affirming our decision, the Second Circuit stated:

While we agree with the proposition that regulations should be construed, if possible, in such a way as to preserve their validity, we refuse to torture the plain language of this regulation in order to derive a meaning patently contrary to the Commissioner's actual intent.

The tax court reasoned that because the regulation should be construed as valid if possible and because the regulation would be invalid if it applied to all game shows including those whose markets were not primarily topical or transitory, the Commissioner must therefore have intended sentence four to bar only topical, transitory game shows. 84 T.C. at 274-77. This flies in the face of the Commissioner's own assertion here and in the tax court that he, himself, intended the fourth sentence of this regulation to impose a "flat rule" against ITCs for all game shows. It also has the effect of reading out of the regulation the very regulatory language which it purports to validate. [784 F.2d at 73.]

The court thus held sentence four of section 1.48-8(a)(3)(iii), Income Tax Regs., to be invalid insofar as it includes game shows. 784 F.2d at 77.

The Claims Court in *Cosby* similarly held sentence four of the regulation insofar as it includes game shows and the

first part of sentence five insofar as it includes variety shows to be invalid. 8 Cl. Ct. at 441, 443-444.

Whether we interpret the variety show exclusion analogously to our interpretation of the game show exclusion in *Goodson-Todman* or to the Second Circuit's interpretation is irrelevant to the outcome of this case and future cases. Only variety shows that, unlike the programs, are topical or transitory will be ineligible for the investment tax credit. We agree with the conclusions of the Court of Appeals in *Goodson-Todman* and hold the categorical exclusion of variety shows to be an invalid interpretation of the statute.

Respondent additionally argues that the programs are ineligible for the credit under the first two sentences of section 1.48-8(a)(3)(iii), Income Tax Regs. Respondent raises arguments that we have previously rejected herein.

The first sentence of the regulation merely repeats the topical or transitory test contained in the statute. As demonstrated above, the programs satisfy this standard.

Respondent interprets the second sentence of the regulation as follows:

A proper reading of the second sentence of [the] * * * regulation reveals that the content test imposed seeks to distinguish not between films that deal with current events and those that do not, but between films that deal with personalities and events and those that deal with a dramatization or story.

To the extent that respondent's argument is that eligibility for the credit depends upon whether the program presents a unified story or several discrete sketches or performances, we have previously rejected it as unsupported by the statute. Indeed, by its terms the second sentence disqualifies programs dealing primarily with "events and personalities of current interest." Emphasis supplied. As our previous discussion of the production and content of the programs indicates, the programs satisfy this "current interest" test. See *Goodson-Todman Enterprises v. Commissioner*, 84 T.C. at 272, affd. 784 F.2d at 73; *Cosby v. United States*, 8 Cl. Ct. at 442.

We have considered other arguments of the parties; in view of our disposition of the issue, it is not necessary to address them.

Petitioner is entitled to the investment tax credit with respect to the programs.

*Decision will be entered for the petitioner.*

Reviewed by the Court.

STERRETT, SIMPSON, GOFFE, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, CLAPP, SWIFT, JACOBS, GERBER, WRIGHT, and PARR, *JJ.*, agree with this opinion.

WILLIAMS, *J.*, did not participate in the consideration of this case.